ROBERT ORR AND COMPANY, Appellee,

*v.*

DONALD R. KING, Commissioner, etc., et al., Appellants.

430 S.W.2d 446.

(*Nashville,* December Term, 1967.)

Opinion filed July 19, 1968.

GEORGE F. McCANLESS, Attorney General, and MILTON P. RICE, Deputy Attorney General, Nashville, for appellant, Donald R. King, Commissioner.

W. W. BERRY, Nashville, for appellee.

MR. JUSTICE CRESON delivered the opinion of the Court.

This suit is brought to recover privilege taxes paid under protest by the complainant-appellee, Robert Orr and Company. The Chancellor held that the complainant was not liable for the tax in question, and awarded recovery of the amount sued for. Review is sought by the State under the provisions of T.C.A. sec. 16-408 for direct appeal to the Supreme Court in State revenue cases.

The appellant Donald R. King was, at the time this controversy arose, the duly appointed, qualified and acting Commissioner of Revenue of the State of Tennessee. In this position he was charged, by law, with the collection of various privilege taxes. The tax in question is set forth in T.C.A. sec. 67-4203, Item 18.

Complainant-appellee, Robert Orr and Company, is a large wholesale grocery house in Nashville, Tennessee. As part of its business, the complainant sells, at wholesale, packaged meats in a frozen state.

In the latter part of 1965, representatives of the Commissioner of Revenue called upon the complainant to pay State and local privilege taxes imposed by T.C.A. sec. 67-4203, Item 18, which is directed to wholesale dealers in fresh meat. Complainant's protests of non-liability were rejected by the Commissioner and, in January, 1966, the complainant was notified to appear before the County Court Clerk of Davidson County to show cause why a distress warrant should not be issued against it for failure to pay this privilege tax. On June 14, 1966, the complainant paid the privilege tax to the State and to the County, under protest. Thereafter, it instituted this suit for recovery of such payment.

The provision of the taxing statute in question has been in effect since 1937. The portions of that section pertinent to this controversy are, as follows:

"*67-4203. Privileges taxable—Rates.*—The occupations, vocations, and businesses taxable are set forth in the following Items: * * *

*Item 18. Butchers* — Butchers, retail and wholesale dealers in fresh meat selling from an office, stall, store, wagon or other vehicle at wholesale or retail shall pay the following tax:

*       *       *       *       *       *

Wholesale.—

Each person engaged in the business of wholesale dealer in fresh meats, other than retail butchers as above provided: In counties of 50,000 inhabitants or over, each per annum... ............. .......... ....:$200.00

*       *       *       *       *       *

(Acts 1937, ch. 108, art. 2, sec. 1, Item 16; 1937, ch. 192, sec. 20; 1939, ch. 21, sec. 2; 1947, ch. 212, sec. 6;

C.Supp.1950, sec. 1248.2, Item 18 (Williams, sec. 1248.29); Acts 1957, ch. 302, sec. 1.) * * *''

In the lower court, the complainant introduced proof which tended to show a substantial difference between "frozen" and "fresh" meats. The complainant's proof also tended to show that rarely in the past had wholesalers of only frozen meats been called upon to pay this tax. In response, the State endeavored to show that there is no difference in purity, quality, edibility, or nutritional value between fresh and frozen meats, and therefore, the language of the statute, referring to "fresh meats" includes raw meats in a frozen state. Testimony was given by several State revenue agents that, in the past, this privilege tax had been collected from both retail and wholesale outlets which sold only frozen meats; and that the present case was unique in striving to exclude frozen meat dealers from the coverage of the tax in the statute.

The case was heard by the Chancellor upon bill, answer, and depositions of witnesses. In finding the complainant not liable for the tax, the Chancellor in a memorandum opinion stated:

"The proof shows that when meat is frozen a physical change takes place and it is no longer the same as it was before. The tissues are broken down and acquire a different texture, and the meat has a different flavor. It will be noted that defendants in their brief use the expression '* * * who deal exclusively in meats that have been thus *preserved.*' (Emphasis supplied.) Meats may be otherwise preserved by smoking, canning, drying and probably by many other processes, and when so preserved they cease to be 'fresh meats.' The Court is therefore of the opinion that 'frozen meats' are not 'fresh meats.'

The Court is further of the opinion that the term 'fresh meats' used in the aforequoted section of the Revenue Law does not include 'frozen meats.'

The State assigns as error that (1) the Chancellor erred in disregarding respectable and long-standing Federal and sister-state authorities to the effect that frozen, uncooked meats, for tax purposes, are synonymous with fresh meats; (2) the Chancellor erred in disregarding the prior administrative construction of T.C.A. sec. 67-4203, Item 18; and (3) the Chancellor erred in holding the complainant not liable for the tax imposed upon dealers at wholesale in fresh meats.

■ The ultimate issue before this Court is whether or not the complainant wholesale grocer is liable for the privilege tax on the sale of "fresh meats" imposed by T. C. A. sec. 67-4203, Item 18, when the only sales are of meats in a frozen state. To reach this ultimate issue and thus to determine the proper incidence of the tax, this Court will examine the following factors to ascertain if the statute encompasses "frozen meat" when it speaks of "fresh meats": (1) scientific differentiation, (2) popular connotation or understanding, (3) legislative intent, (4) prior judicial decisions, and (5) prior administrative construction.

The complainant introduced expert testimony of the Food and Drug Director of the State Department of Agriculture, the Principal Chemist in the State Department of Agriculture Food and Drug Laboratories, and the head of the Department of Food Technology at the University of Tennessee. In summary, these men testified that freezing is simply another way of preserving meat; but it is a natural method of preservation as opposed to an artificial or synthetic method using chemical preserva-

tives. It was stated that when meat is frozen, there is some physical change in the meat itself caused by the breaking down of the cell walls and connecting tissue. Confirming the allegations of steak connoisseurs and the suspicions of numerous housewives, these scientists testified that the process of freezing and thawing causes changes in flavor, texture, and color. One of these witnesses explained that frozen meat develops its own set of biological and chemical characteristics, as opposed to those which it possessed before freezing. It was also stated that frozen meats are more susceptible to decomposition and bacteriological buildup.

The testimony did not attempt to establish that the nutritional value, or range of potential usage was substantially affected; but it is perfectly clear to this Court that, scientifically, the terms "fresh meat" and "frozen meat" are not to be used synonymously.

The complainant produced several prominent restauranteurs who testified that they considered there is a significant difference between "fresh" and "frozen" meats. They stated that their customers often demanded fresh or unfrozen meats. The fact is well known that the shopping housewife distinguishes between meats which are "fresh" and those which are "frozen." Thus, it is felt that the distinction between "fresh" and "frozen" meats is not solely a habit of gourmets, but is a generally accepted view.

█ The State contends that the Legislature, in enacting the privilege tax in question, meant to include "frozen meat" in the statutory language of T.C.A. sec. 67-4203, Item 18—"fresh meats." It argues that the term "fresh" embraces the term "frozen" unless the Legislature specifically draws a distinction. We cannot accept that

contention. The language used in the statute was placed there when the statute was enacted in 1937. We cannot conclude otherwise than that the legislators accepted the popular understanding of the distinction between "fresh" and "frozen" meat. In fairness to the taxpayer, we cannot assume that the legislators then viewed these two terms as synonymous, but omitted saying so in composing the taxing statute.

The State argues that the Chancellor disregarded the authorities in point. Although recognizing that there are no Tennessee cases in point, the State relies on a 1903 Florida case, an 1887 Federal Court case, and a 1909 Federal Court case. While these cases contain some dicta to the effect that frozen food should or could be classed as fresh food, we do not consider them as controlling or persuasive on the points at issue in the present case.

The State finally argues that even if "frozen meat" is not obviously to be classified as "fresh meat", nevertheless, the prior administrative construction given to the statute making the terms synonymous has been acquiesced in by taxpayers generally, and that this has persuasive force. The State contends that the Court should apply the rule of statutory construction that:

> "* * * where a statute is of doubtful meaning and subject to construction, that administrative interpretations, especially where they are unchallenged over a long period of time, are accorded persuasive weight by the court and usually will be followed unless palpably erroneous." *Gallagher v. Butler* (1964) 214 Tenn. 129, 378 S.W.2d 161.

In this regard, the State introduced testimony from the Director of the Miscellaneous Tax Division of the

State Department of Revenue and his area supervisors from each Grand Division of the State. These men testified that the tax had been applied uniformly to sellers of only frozen meats. They further testified that the statute had not been questioned prior to this case except by those who do not consider themselves "butchers" within the language of the statute because the meat was not cut on the premises. These witnesses submitted a list of establishments whose owners had paid the tax and were licensed, although the stores sold only frozen meats. In this respect, it must be noted that the lists filed appeared to contain predominantly retail outlets.

The complainant responded by adducing testimony tending to show that the tax had not been assessed against wholesalers dealing exclusively in frozen meats until late in 1965; that the assessment was promptly objected to; and that the wholesalers did not acquiesce in any administrative construction of the statute making them liable.

The president of the complainant company testified that the frozen food industry did not become widely accepted until well after World War II, and that his company did not begin carrying frozen meats until about 1957. He further stated that no attempt was made to collect the tax until the latter part of 1965.

The executive vice president of the Tennessee Wholesale Grocers Association testified that his organization represents approximately fifty-five wholesale grocers throughout the State and that to his knowledge, none of these paid the tax prior to 1965. Late in that year he began to get inquiries from several of his members as to their liability for the tax. In response to these inquiries, he published a special bulletin to all members requesting

information regarding their prior payment of the tax. He testified that he received fifty replies, and none of these dealers had been previously taxed.

■ Regardless of how the case is viewed, sufficient doubt is present to invoke the rule that where there is an ambiguity in the coverage of the taxing statute, it must be resolved in favor of the taxpayer. This Court stated in the recent case of *United Inter-Mountain Telephone Co. v. Moyers* (1968), 221 Tenn. 246, 426 S.W.2d 177:

"'* * * we have consistently held that ambiguities in taxing statutes ought to be resolved in favor of the taxpayer, and that such statutes are not to be extended by implication beyond the clear import of the language used. *First Nat. Bank of Memphis v. McCanless*, 186 Tenn. 1, 207 S.W.2d 1007 (1948); *Templeton v. Bartlett*, 190 Tenn. 347, 229 S.W.2d 509 (1950); *Neuhoff Packing Co. v. City of Chattanooga*, 191 Tenn. 395, 234 S.W.2d 824 (1950); *Evans v. Memphis Dairy Exchange*, 194 Tenn. 317, 250 S.W.2d 547 (1952). And, time and again, we have said that tax statutes must be, as a general thing, liberally construed in favor of the taxpayer and strictly construed against taxing authority. *Western Pipeline Constructors Inc. v. Dickinson*, 203 Tenn. 248, 310 S.W.2d 455 (1958); *Gallagher v. Butler*, 214 Tenn. 129, 378 S.W.2d 161 (1963).'"

It results from what has been said above that the decision of the Chancellor is affirmed. The costs of this appeal are assessed against the appellants.

BURNETT, CHIEF JUSTICE, and DYER, CHATTIN and HUMPHREYS, JUSTICES, concur.